## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |  |
|---|---|---|
| ROBERT JORDAN, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-501 |
| | ) | |
| SUSAN A. OSMUN, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

### Memorandum Opinion

This matter comes before the Court on Defendants Susan and Jordan Osmun's Motion to Dismiss for Failure to State a Claim. Dkt. No. 42. The dispute arises out of alleged misappropriation of funds by Susan Osmun while acting as attorney in fact for her aunt, Lucille Kelly. Plaintiffs are Mrs. Kelly's current attorneys in fact. For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss.

### I. Background

Robert Jordan and Cheryl Anacker (hereafter "Plaintiffs"), pursuant to their Durable Power of Attorney for Lucille Kelly dated April 1, 2016, filed a complaint against Susan Osmun, Ms. Kelly's former attorney in fact since September 2008, alleging breach of fiduciary duty, conversion, fraud and unjust enrichment.

On or about September 24, 2008, Lucille Kelly executed a durable power of attorney naming her husband, Frank Kelly, and her niece, Susan Osmun, as attorneys-in-fact, each independently empowered to act independently on Mrs. Kelly's behalf. Mr. Kelly passed away

in March 2015 and Susan Osmun was qualified as the executor of Mr. Kelly's estate to which
Mrs. Kelly is the sole heir.  Pursuant to her power of attorney, Susan Osmun sold Mr. and Mrs.
Kelly's jointly owned home for $460,000 on November 20, 2015.  Defendants travelled together
to Virginia prior to the sale and removed Mrs. Kelly's personal property from the home.  The
property is now being stored in New Jersey at Defendants' home.  On December 1, 2015, Mrs.
Kelly, through her attorney in New Jersey, sent a demand letter to Susan Osmun requesting
information about the financial status of Mr. Kelly's estate and Mrs. Kelly's personal finances.
Mrs. Kelly sent a second letter to the same effect on February 3, 2016.  Susan Osmun did not
directly respond to the attorney letters but did send communications to Mrs. Kelly between
February 3, 2016 and March 10, 2016, through a social worker at The Virginian Retirement
Community, where Mrs. Kelly was living at the time.  During this time, Plaintiffs allege that
Mrs. Kelly was also in direct contact with David Osmun but make no mention of specific
interactions.

In a letter to Mrs. Kelly dated February 5, 2016, Susan Osmun wrote that she had settled
Mr. Kelly's estate.  She advised Mrs. Kelly that the latter was in good financial shape to continue
her living arrangement at The Virginian but that any large expenditure would jeopardize the
arrangement.  Susan Osmun also stressed that she did not want to burden Mrs. Kelly with
specifics of finances but that she had Mrs. Kelly's best interests at heart.  Finally, Susan Osmun
informed Mrs. Kelly that she and her husband were very upset to be yelled at and accused (in the
letters from Mrs. Kelly's attorney) of not having Mrs. Kelly's best interests at heart.  On March
10, 2016, Susan Osmun sent an email to the social worker with an attachment and instructions to
deliver the attachment to Mrs. Kelly.  The attachment listed four of Mrs. Kelly's bank accounts
and their corresponding balances.  The attachment stated that the account balance on the Bank of

America account was $106,651.39 at the time. As of March 10, 2016, the balance in that account was actually $4,372.79.

However, around the same date of these letters, Susan Osmun spent or withdrew money from Mrs. Kelly's accounts on numerous occasions.

- On December 3, 2015, Susan Osmun wrote a check to "Renewal by Anderson" for $10,404 from Mrs. Kelly's Wells Fargo checking account. The memo line contains Defendants' address in New Jersey.

- On February 3, 2016, Susan Osmun wrote herself a check for $300,000 from Mrs. Kelly's Wells Fargo checking account. The memo line for this check contains the word "house" and the back of the check states that it is for deposit only to Barclays Bank. Mrs. Kelly does not hold an account at Barclays Bank.

- On February 9, 2016, Susan Osmun transferred $40,000 from Mrs. Kelly's Wells Fargo savings account to a home improvement company.

- On January 25, 2016, Susan Osmun's name appears on the transfer line for a $5,000 transfer from Mrs. Kelly's Wells Fargo savings account to a Barclays Account ending in 5430.

- On January 6, 2016, Susan Osmun transferred $10,000 from Mrs. Kelly's Wells Fargo savings account to a PNC Bank account ending in 8644. Susan Osmun's name appears on the transfer line and Mrs. Kelly does not own an account at PNC Bank.

- On February 10, 2016, Susan Osmun transferred $5,082 from Mrs. Kelly's Wells Fargo savings account to "M&T Mortgage." Mrs. Kelly did not have a mortgage at this time.

- Since March 2015 through January 29, 2016, Susan Osmun transferred $1,795.04 from Mrs. Kelly's Wells Fargo checking account toward a Bloomingdales Debit in the name of "Susan Lusquinos," which is believed to be Susan Osmun's prior name.

- By February 2016, Susan Osmun had transferred $26,984 from Mrs. Kelly's Wells Fargo and Bank of America accounts toward a Bank of America Credit Card. The credit card was ostensibly used for the benefit of Mrs. Kelly but numerous purchases were for the benefit of Defendants including $3,300 in 2016 to "The Peer Group – Plastic Surgery."

- Also by March 2016, Susan Osmun had also used $125,827 of the funds in Mrs. Kelly's Wells Fargo and Bank of America accounts to pay the bill on an American Express card not in Mrs. Kelly's name.

- Also by March 28, 2016, Susan Osmun transferred $1,148.15 from Mrs. Kelly's Wells Fargo accounts toward a TJX Rewards credit card. Mrs. Kelly does not have such an account.

In addition to the discrete transfers identified above, Susan Osmun made numerous expenditures at gas stations and restaurants as well as liquor, clothing, and grocery stores in New Jersey during the time that Mrs. Kelly remained in Virginia. Many purchases included "cash back" withdrawals. Plaintiffs allege that Mrs. Kelly did not consent to or authorize any of these transfers. Susan Osmun allegedly withdrew a total of $573,729 from March 30, 2015 through April 2016.

On April 1, 2016, Mrs. Kelly revoked Susan Osmun's power of attorney and executed a new durable power of attorney in favor of Plaintiffs. On April 6, 2016, Mrs. Kelly sent another

demand for information, by and through Plaintiffs, to Susan Osmun.  Susan Osmun did not respond to the letter.

Plaintiffs filed the Complaint on May 3, 2016 and alleged federal jurisdiction based on diversity of citizenship and sufficient amount in controversy.  Susan Osmun moved to dismiss the Complaint for lack of diversity of citizenship on the grounds that Plaintiff Robert Jordan and Susan Osmun were both citizens of New Jersey.  Plaintiffs obtained leave to amend their complaint to remedy procedural defects and add Susan Osmun's husband, David Osmun as a co-defendant.  Plaintiffs filed a first amended complaint ("FAC") on July 8, 2016 alleging the following counts:

- Count 1: Breach of Fiduciary Duty (both Defendants);

- Count 2: Aiding and Abetting Breach of Fiduciary Duty (David Osmun, as an alternative to Count 1);

- Count 3: Conversion (both Defendants);

- Count 4: Aiding and Abetting Conversion (David Osmun, as an alternative to Count 3);

- Count 5: Fraud (both Defendants[1]);

- Count 6: Aiding and Abetting Fraud (David Osmun, as an alternative to Count 5);

- Count 7: Unjust Enrichment (both Defendants);

Plaintiffs also seek a constructive trust over any property owned by Defendants to which any misappropriated funds have been applied in an amount not less than $573,729.

Defendants renewed their Motions to Dismiss for lack of jurisdiction and the motions were denied by the Court on September 29, 2016.  Dkt. No. 39.  Defendants now move to

---

[1] The heading to Count 5 in FAC states that it applies only to Susan Osmun.  However, the substance of the pleading, and the heading to Count 6 imply that Count 5 applies to both Defendants.  *See* Dkt. No. 17, at 19-20.

dismiss for failure to state a claim. Dkt. No. 42. The matter has been fully briefed by the parties. On November 18, 2016, Defendants' counsel withdrew from the proceedings, citing a disagreement with Defendants regarding case proceedings. Dkt. No. 52; *see also* Dkt. No. 48 (motion for withdrawal). Defendants did not appear at the hearing on this Motion on December 2, 2016. Dkt. No. 53.

## II. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007). A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. While "detailed factual allegations" are not required, Rule 8 does demand that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. *Id.* Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir . 2011)).

## III. Analysis

Defendants move to dismiss all of the counts in the FAC for failure to state claims upon which relief can be granted. Defendants contend that Plaintiffs have provided no factual

allegations which support imputing liability to David Osmun for any of Susan Osmun's conduct. Defendants also contend that the causes of action sounding in tort and equity (Counts III, V, and VII) against Susan Osmun are barred by the source duty rule because she acted pursuant to an express contract with Mrs. Kelly.[2] Finally, Defendants object to the imposition of a constructive trust because other adequate remedies at law exist to make Plaintiffs whole. This memorandum deals with each issue in turn.

## A. Failure to State a Claim against Defendant David Osmun

Plaintiffs seek to impose liability on David Osmun on the theory that he is jointly liable for his wife's tortious conduct (Counts I, III, V) or, in the alternative, aided and abetted his wife's acts (Counts II, IV, VI), and knowingly accepted the financial benefits that his wife fraudulently obtained from Mrs. Kelly (Count VII). Defendants object that Plaintiffs have failed to allege evidence supporting any of these claims against David Osmun. As discussed below, Plaintiffs have adequately stated a claim for unjust enrichment. The remaining claims against David Osmun must be dismissed.

### 1. Counts I, II, III, IV, IV, and VI

"[T]he Supreme Court of Virginia has refrained from either recognizing or rejecting a separate 'aiding and abetting' tort. *All. Tech. Grp., LLC v. Achieve 1, LLC*, No. 3:12CV701-HEH, 2013 WL 143500, at *4 (E.D. Va. Jan. 11, 2013) (citing *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 604 S.E.2d 403, 411–12 (Va.2004)). Likewise, the Fourth Circuit has not published a position on whether aiding and abetting is a separate cause of action under Virginia law. *See Terry v. SunTrust Banks, Inc.*, 493 F. App'x 345, 356 n.9 (4th Cir. 2012) ("Because we conclude LES was not a fiduciary under Virginia law, we need not resolve SunTrust's alternative

---

[2] Defendants' Motion to Dismiss has a heading section entitled "Plaintiffs Have Failed to State a Cause of Action Against Susan Osmun" but Defendants fail to articulate in this section or elsewhere in the supporting memorandum or reply to the opposition that Count I for Breach of Fiduciary Duty is not sufficiently plead.

argument that Virginia does not recognize a cause of action of aiding and abetting a tort."). As a result, intermediate courts in Virginia and in this district have split on whether the cause of action is cognizable under Virginia law. *Compare, e.g., Calderon v. Aurora Loan Serv., Inc.,* 1:10CV129, 2010 WL 2306343, at *6 (E.D.Va. June 3, 2010)) ("The Plaintiffs have offered no statute or basis in common law that would establish a cause of action for aiding and abetting"); *Tysons Toyota, Inc. v. Commonwealth Life Ins.,* 20 Va. Cir. 399 (1990) ("A defendant who aids and abets in the commission of a tort may be jointly liable for that tort, but he is not liable for a separate tort of aiding and abetting."); *with AvalonBay Communities, Inc. v. Willden,* No. CIV A 1:08-CV-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009), *aff'd,* 392 F. App'x 209 (4th Cir. 2010) ("Virginia law allows a third party to be liable for another party's breach of fiduciary duty when that third party knowingly participated in the breach."); *Sherry Wilson & Co. v. Generals Court, L.C.,* No. 21696, 2002 WL 32136374, at *1 (Va. Cir. Ct. Sept. 27, 2002) ("Thus, unlike some jurisdictions, it may be said that the common law of the Commonwealth has looked with favor upon recovery in tort against those who aid and abet others in the commission of the civil wrong for which damages may be maintained.").

"If state law is unclear or unsettled, a federal court must determine the rule that the state Supreme Court would probably follow, not fashion a rule which an independent federal court might consider best." *Meadow Ltd. P'ship v. Heritage Sav. & Loan Ass'n,* 639 F. Supp. 643, 653 (E.D. Va. 1986). On this basis, some courts have conducted analysis on a cause of action for aiding and abetting despite misgivings about its appropriateness. *See id.* ("the Court assumes *arguendo* that Virginia would recognize these causes of action"); *see also All. Tech. Grp.,* 2013 WL 143500, at *5 (finding that "[i]t is not entirely clear that *Patteson* created a separate tort of 'aiding and abetting,'" but nevertheless addressing its elements as "a viable alternative theory to

secure joint liability"). Other courts in this district have declined to analyze a separate aiding and abetting claim. *See MicroStrategy Servs. Corp. v. OpenRisk, LLC*, No. 1:14CV1244 JCC/IDD, 2015 WL 1221263, at *3 (E.D. Va. Mar. 17, 2015), *on reconsideration*, No. 1:14CV1244 JCC/IDD, 2015 WL 2126924 (E.D. Va. May 6, 2015) ("This Court declined to create such a cause of action [for aiding and abetting] and dismissed a claim identical to the one here for aiding and abetting a breach of fiduciary duty."); *Calderon v. Aurora Loan Serv., Inc.*, 1:10CV129, 2010 WL 2306343, at *6 (E.D.Va. June 3, 2010)).

The Court previously found that Virginia law allows a third party to be liable for another party's breach of fiduciary duty when that third party knowingly participated in the breach.[3] *AvalonBay*, 2009 WL 2431571, at *11. "To be liable, the third party must affirmatively aid the breach with the requisite mens rea, or culpable state of mind." *Id.* Plaintiffs argue that in the alternative, David Osmun can be held as a joint tortfeasor if, as in *Alliance Tech.* the "defendant: (1) knows about another's duty and breach; (2) participates in it or directs its commission; and, (3) benefits from it." *All. Tech. Grp.*, 2013 WL 143500, at *5 (citing *Patteson v. Horsley*, 70 Va. 263, 270-71 (1877). Defendants agree that to the extent David Osmun could be liable jointly or for aiding and abetting it should be based on the *Patteson* standard.

Under either test, Defendants only challenge the analogous element of affirmatively aiding the breach, or participation or direction in the commission of the breaching conduct. They argue that David Osmun did not participate in the alleged conduct. They note that Plaintiffs have not pleaded that he negotiated, wrote, or physically took possession of any checks; took possession of any cash; or was a signatory on any related documents. Plaintiffs do allege that David Osmun knew of the breach of fiduciary duty and conversion of Mrs. Kelly's assets and never attempted to return the funds or inform Mrs. Kelly about the misappropriation despite

---

[3] Neither party has cited to the Court's decision in *AvalonBay*.

being in "direct contact" with her from April 2015 to April 2016. *See* Dkt. No. 17, at ¶ 50. David Osmun also assisted his wife in removing personal property from the Kelly home prior to its sale and relocating the property to the Osmun's shared home in New Jersey.

Plaintiffs argue that the conduct alleged in the complaint constitutes sufficient participation in the breach of fiduciary duty, conversion, and fraud. Plaintiffs point to cases where state and federal courts in Virginia have sustained aiding and abetting claims despite the absence of a direct relationship between the alleged tortfeasor and the victim. In *Tysons Toyota, Inc. v. Globe Life Ins. Co.*, the Fourth Circuit reversed a district court ruling denying an aiding and abetting claim for breach of fiduciary duty to a corporate entity where a member of the board of directors in the plaintiff car dealership usurped a corporate opportunity by negotiating a side-deal with the defendant insurance company and related defendants. 45 F.3d 428 (Table), 1994 WL 717598 at *1-2 (4th Cir. 1994) (unpublished). The court found that the defendants were on constructive notice of the board member's breach of fiduciary duty because of the nature of the transactions. *Id.* at *3. The court also found that plaintiff had sufficiently pleaded defendants' participation in the misconduct because they enticed the board member with an incentive mechanism, but for which, the board member would not have profited from the breach of fiduciary duty. *See id.* at *2, 4. Following the reasoning in *Tysons Toyota*, the Circuit Court of Virginia found that a contractor, A&L, who fraudulently permitted its name to be used on a building permit, was liable for aiding and abetting alleged tortious conduct by the contractor who actually provided the construction services, Becker Interiors. *Kieft v. Becker*, 58 Va. Cir. 171, 172 (2002). The court did not expressly analyze the participation prong of aiding and abetting liability but did find that A&L aided and abetted where the only evidence of participation put forth by the plaintiff was that A&L signed the building permits thereby allowing Becker Interiors

to undertake the construction project. *Id.* at 174-75.

While *Tysons Toyota* and *Kieft* both suggest that aiding and abetting liability can exist in the absence of a direct fiduciary or contractual relationship between the parties, those decisions also recognized the need for affirmative action on the part of the party accused of aiding and abetting. In *Tysons*, the defendants employed an incentive scheme to compel the board director breach. *Tysons Toyota, Inc.*, 1994 WL 717598 at *2. In *Kieft*, A&L fraudulently misrepresented its role on building permits. *Kieft*, 58 Va. Cir. at 172. Fatally, Plaintiffs have not alleged analogous affirmative conduct by David Osmun. David Osmun did not have a legal duty to report any alleged misappropriations to Mrs. Kelly. Therefore, his failure to inform her of the conduct when he had the opportunity cannot satisfy the affirmative conduct requirement. The remaining allegation is that he removed property from Mrs. Kelly's house to prepare it for sale in March 2015. This conduct was consistent with Susan Osmun's duty as executor of Mr. Kelly's estate. Furthermore, the removal of property predates the alleged fraudulent conduct. As a result, Plaintiffs have failed to state a claim that David Osmun is liable as a joint tortfeasor or for aiding and abetting Susan Osmun in allegedly tortious conduct.

### 3. Count VII

"Under Virginia law, unjust enrichment is an implied contract action based on the principles of equity." *Butts v. Weltman, Weinberg & Reis Co.*, LPA, No. 1:13CV1026 JCC/IDD, 2013 WL 6039040, at *2 (E.D. Va. Nov. 14, 2013). The claim has three elements: (1) the plaintiff's conferring of a benefit on the defendant, (2) the defendant's knowledge of the conferring of the benefit, and (3) the defendant's acceptance or retention of the benefit under circumstances that "render it inequitable for the defendant to retain the benefit without paying for its value." *Microstrategy, Inc. v. Netsolve, Inc.*, 368 F. Supp. 2d 533, 537 (E.D. Va. 2005)

11

(quoting *Nossen v. Hoy*, 750 F.Supp. 740, 744–45 (E.D.Va. 1990)).

The FAC alleges that David Osmun benefitted from his wife's conduct when she used Mrs. Kelly's account to remodel and finance the Osmun family home and to pay for joint living expenses. The FAC also sufficiently alleges for the purposes of the Motion that David Osmun knew of the benefit. Plaintiffs argue that David Osmun should have reasonably expected to repay Mrs. Kelly for the money used for personal purposes. The Court agrees that this claim is satisfactorily plead to survive the present Motion. David Osmun knew the financial resources available to the married couple and therefore would have known that the money spent on the home and on living expenses did not come from the Osmuns' bank account. David Osmun also knew that his wife was managing Mrs. Kelly's financial affairs and controlled her bank accounts. Susan Osmun also represented that her husband knew that Mrs. Kelly, and others, had expressed concerns about the management of the money. *See* Dkt. No. 17, Exh. E ("It is very stressful and disturbing to be yelled at, accused of all sorts of things and called names by you when I am doing the best I can by making sure all of your needs are met, especially doing this long distance. It is very upsetting to me and Dave."). These assertions, taken as true for the purposes of the Motion, present circumstances that render it inequitable for David Osmun to retain the benefits he received without paying for their value. Thus, Plaintiffs have sufficiently stated a claim for unjust enrichment against David Osmun.

## B. Failure to State a Claim against Defendant Susan Osmun

Defendants argue that all of the conduct alleged against Susan Osmun arises out of her express "power of attorney" contract with Mrs. Kelly. Thus Plaintiffs cannot state a claim against Susan Osmun arising in tort (Counts III and V) because, pursuant to the source duty rule, any cause of action can only be brought in contract. Similarly, they cannot state a cause of

action against Susan Osmun for unjust enrichment (Count VII) because her relationship to Mrs. Kelly was governed by an express contract.

It is true, as Defendants assert, that "losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of contracts." *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 613 (2004). Defendant is also correct that "[a] condition precedent to the assertion of such a claim [for unjust enrichment] is that no express contract exists between the parties. *Butts*, 2013 WL 6039040, at *3. But both of Defendants' arguments against the tort and equity claims presuppose the existence of a valid contract between Mrs. Kelly and Susan Osmun.

However, a power of attorney is not a contract. A contract is "a complete agreement which requires acceptance of an offer, as well as valuable consideration." *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346 (1980) (citations omitted). A contract is not revocable at the pleasure of the maker but a power of attorney is. *See Burdell v. Denig*, 92 U.S. 716, 720 (1875) ("It is claimed that the instrument is but a power of attorney revocable at the pleasure of the maker...[b]ut we are of a different opinion. We think the instrument is a contract.")

Mrs. Kelly's grant of power of attorney was revocable at will, and was in fact revoked. No consideration was given for the agreement. Susan Osmun was not even required to sign or have notice of the power of attorney in order for it to take effect. Thus, the power of attorney in this case exhibits none of the characteristic indicia of contract. Lacking any such evidence of a contract, Defendants argue that the claims arise out of contract because Plaintiffs have pleaded unjust enrichment which requires the Court to infer a quasi-contract between Mrs. Kelly and Susan Osmun. This argument disregards the fact that "[a]lthough [a plaintiff] may be unable to prevail on both theories, at this stage, [the plaintiff] is entitled to allege alternative facts and

theories which support different and contradictory claims for relief." *McKay Consulting, Inc. v. Rockingham Mem'l Hosp.*, 665 F. Supp. 2d 626, 632–33 (W.D. Va. 2009). Though Plaintiffs' unjust enrichment claim would require a finding of a quasi-contract, their allegation here does not prevent Plaintiffs from arguing in Counts III and V that alternatively no contract exists between the parties.

Even if the power of attorney is a contract between Mrs. Kelly and Susan Osmun, Defendants ignore the fact that "[a] party can, in certain circumstances, show both a breach of contract and a tortious breach of duty." *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 507 S.E.2d 344, 347 (1998) (citation omitted). Both causes of action are appropriate if the "party establishes an independent, willful tort that is factually bound to the contractual breach but whose legal elements are distinct from it." *Erdmann v. Preferred Research, Inc.*, 852 F.2d 788, 791 (4th Cir.1988) (citations omitted). Counts III and V meet this requirement.

"The duty not to defraud is owed by everyone to everyone, regardless of any special relationship between the alleged tortfeasor and victim. Thus, fraud is an independent, wilful tort under Virginia law." *Hewlette v. Hovis*, 318 F. Supp. 2d 332, 337 (E.D. Va. 2004); *see also Se. Wholesale Corp. v. Cox Comm. Hampton Roads, LLC*, No. 2:12CV701, 2013 WL 2147478, at *9 (E.D. Va. May 14, 2013) (relying on *Hewlette* and finding the same). "Like the duty not to defraud, the duty not to convert the property of another for one's own purposes is owed by everyone to everyone, and conversion therefore constitutes a wilful, independent tort from the contract claim". *Id.*; *see also PGI, Inc. v. Rathe Prods., Inc .*, 265 Va. 334, 344 (2003) ("A cause of action for conversion lies independent of an action in contract and may provide a separate basis [for suit], distinct from the contract"). Because Counts III (conversion) and V (fraud)

allege violations of duties which are independent of those imposed by the power of attorney, these causes of action should not be dismissed pursuant to the source duty rule.

The remaining Counts I (breach of fiduciary duty) and VII (unjust enrichment) also should not be dismissed. Defendants offer no argument for the dismissal of Count I and Plaintiffs have pleaded the required elements for that claim. Defendants argue that Plaintiffs have failed to state a claim for unjust enrichment because the relationship between Mrs. Kelly and Susan Osmun was governed by an express contract, the durable power of attorney. For the reasons discussed above, the power of attorney is not a contract. Defendants offer no other objection to the unjust enrichment claim. Thus, Plaintiffs have adequately pleaded that Mrs. Kelly conferred a benefit on Susan Osmun by way of control of Mrs. Kelly's assets, Susan Osmun knew she had control over these assets, and she used the assets in a way that was inappropriate without paying for the value she obtained.

For the foregoing reasons, Plaintiffs have adequately stated a claim with respect to Counts I, III, V, and VII against Susan Osmun.

### C. Formation of a Constructive Trust

Plaintiffs argue that the Court should impose a constructive trust over Defendants' property in an amount of not less than $573,279 to account for the amount of damages alleged in the FAC because Plaintiffs have no adequate remedy at law. Defendants argue that the formation of a constructive trust is inappropriate in this case because Plaintiffs have an alternative adequate remedy at law. The Court finds that the trust is appropriate in this case.

"Constructive trusts arise, independently of the intention of the parties, by construction of law; being fastened upon the conscience of him who has the legal estate, in order to prevent what otherwise would be a fraud." *Faulknier v. Shafer*, 264 Va. 210, 215 (2002) (citations omitted).

15

"Such trusts occur not only where the property has been acquired by a fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained." *In re Dameron*, 155 F.3d 718, 722 (4th Cir. 1998) (quotations and citations omitted). "[T]rial courts have broad equitable discretion in determining whether imposition of a constructive trust is appropriate." *Patel v. Anjali*, LLC, 81 Va. Cir. 264 (2010). "But a constructive trust is an equitable remedy available under specific conditions and when legal remedies, such as monetary damages, would be insufficient." *Bank of Hampton Roads v. Powell*, 292 Va. 10, 16 (2016). Also, "in order to be entitled to the benefit of a constructive trust, a claimant's money must be 'distinctly traced' into the chosen action, fund, or other property which is to be made the subject of the trust. *Crestar Bank v. Williams*, 250 Va. 198, 204 (1995).

Neither party cites to factually analogous case law in support of, or opposition to, the formation of a constructive trust, but the Supreme Court of Virginia's decisions in *Tauber v. Virginia*, 255 Va. 445 (1998) ("*Tauber I*") and *Tauber v. Virginia ex rel. Kilgore*, 263 Va. 520 (2002) ("*Tauber II*") are instructive. Both decisions arise out of a trial court's creation of a constructive trust governing the liquidation of assets of a dissolved not for profit corporation. *Tauber I*, 255 Va. at 456. The plaintiffs "alleged that funds and assets received by the defendants as directors and trustees of a charitable corporation 'were misappropriated and diverted' contrary to law that requires such funds to be used only for charitable purposes 'and not for private inurement.'" *Id.* at 449. The chancery court found that "[t]he transactions show an entire course of self-dealing by the directors of the charity. They were able to acquire interests in the real estate, the equipment and lease, and were able to use tax benefits belonging to the former charity to enhance the gain of the for-profit corporation." *Id.* at 453. As a result, the Supreme

16

Court of Virginia affirmed the imposition of a constructive trust over all of the assets and liabilities of the non-profit corporation. *Id.* at 456.

In *Tauber II*, the Supreme Court of Virginia reviewed the chancellor's tracing of the non-profits assets misappropriated by the defendants. *Tauber II*, 263 Va. at 540. The chancery court entertained testimony and reports from accountants on both sides before awarding a constructive trust in the amount of $26,372,438. *Id.* at 542-43. The Supreme Court of Virginia affirmed the decision and held that the constructive trust also extended to, among other things, donations made by the former trustee to charities controlled by the trustee. *Id.* at 544. The court held that the funds were so subject because "the defendants failed to prove that the 'donations' were made from their own personal funds, rather than from the assets of JMHI that were subject to the constructive trust." *Id.*

Just as the trustee in the *Tauber* cases had a specific duty to use the funds only for charitable purposes rather than private benefit, Susan Osmun had a duty as attorney in fact to use the estate funds for the benefit of Mrs. Kelly. *See Tauber I*, 255 Va. at 449. While *Tauber I* arose after fact finding, the transactions alleged in the FAC, taken as true for the purposes of this motion, similarly chronicle "an entire course of self-dealing by" Susan Osmun including the purchase of plastic surgery, as well as home improvements and mortgage payments on the Defendants' home in New Jersey. *See id.* at 453. Defendants argue that the FAC does not sufficiently trace the property that is subject to the trust, but such an argument fails because, as the Supreme Court observed in *Tauber II*, once the plaintiffs have set forth that the money was inappropriately comingled into the defendants assets, the burden shifts to the defendants to prove that expenditures were made from personal funds rather than those funds subject to the constructive trust. *See Tauber II*, 263 Va. at 544. Because, as alleged in the FAC, Defendants

17

transferred sums from Mrs. Kelly's accounts to Defendants' accounts, they now bear the burden of showing that purchases made from the comingled accounts, identified in the FAC, were made only from personal funds. Where Defendants allegedly made payments directly from Mrs. Kelly's accounts to assets controlled by Defendants there is no question that the funds have been adequately traced.

Defendants other arguments against the imposition of the constructive trust are also without merit. First, Magistrate Judge Nachmanoff's order requiring Defendants to set aside $300,000 in escrow, Dkt. No. 6, does not, as Defendants argue, render the present request for a trust in the amount of $573,729 facially flawed. That order was issued prior to the filing of the FAC. The Court may now, on the basis of the FAC and subsequent filings, issue a constructive trust that captures the breadth of alleged harm.

Second, Plaintiffs are not required to plead the constructive trust with particularity in accordance with Fed. R. Civ. P. 9(b) because the basis for imposition of the trust is not necessarily actual fraud but those instances where, as here, "it is contrary to the principles of equity that [the property] should be retained, at least for the acquirer's own benefit." *St. Joe Co. v. Norfolk Redevelopment & Hous. Auth.*, 283 Va. 403, 409 (2012).

Third, Defendants' reliance on *Bank of Hampton Roads* for the proposition that a constructive trust is inappropriate where monetary damages could be sufficient is misplaced. In *Bank of Hampton Roads*, the Supreme Court of Virginia held that plaintiff's contractual right to a discrete parcel of property which had been sold did not entitle the plaintiff to a constructive trust over the proceeds of a second parcel of defendant's property because the former injury was not distinctly traceable to the latter asset. *Bank of Hampton Roads*, 292 Va. at 16. As discussed above, the transfers alleged in the FAC are traceable to Defendants' assets. Mrs. Kelly's harm

18

does not arise out of an unrelated contractual dispute but out of the alleged misappropriation manifest in Defendants' assets and accounts. Even if *Bank of Hampton Roads* is read as broadly as Defendants argue, legal damages may be insufficient to protect Mrs. Kelly, who would be treated as equal to all other creditors in a bankruptcy proceeding. *See Crestar Bank*, 250 Va. at 204 (finding that absent a constructive trust, "the claim of each investor-beneficiary for breach of trust becomes merely that of a general creditor."). A significant portion of the misappropriated money may be inaccessible. For example, significant funds were allegedly funneled into Defendant's family home, in the form of mortgage payments and home improvements. This property is partially protected from creditors during a bankruptcy. *See* Va. Code Ann. §§ 34-4, 34-18, 64.2-311. Thus a legal remedy limited to money damages may be insufficient to remedy the alleged misappropriation in this case.

For all of these reasons, the Court imposes a constructive trust in the amount of $573,729 covering the real and personal property acquired or owned by Defendants to which misappropriated funds were applied.

### IV. Conclusion and Recommendation

For the reasons described in the preceding section, the Court orders that the Motion is GRANTED IN PART with respect to counts (I, II, III, IV, V, and VI) against David Osmun and DENIED IN PART with respect to all remaining claims against the Defendants. The Court also DENIES Defendants' objection to the imposition of a constructive trust. The Court will institute the trust by separate order. A separate order on the Motion shall also follow.

December 8, 2016
Alexandria, Virginia

/s/
[signature]