**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

ROBERT JORDAN, *et al.*,

        *Plaintiffs,*

    v.

SUSAN A. OSMUN, *et al.*,

        *Defendants.*

Civil Action No. 1:16-cv-501
Hon. Liam O'Grady
Hon. Michael S. Nachmanoff

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs' Second Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 37 (Dkt. No. 124), and Plaintiffs' Motion for Summary Judgment. (Dkt. No. 127). The dispute arises out of alleged misappropriation of funds by Susan Osmun while acting as attorney in fact for her aunt, Lucille Kelly. Plaintiffs are Mrs. Kelly's current attorneys in fact. For the reasons discussed below, the Court **GRANTS** Plaintiffs' Second Motion for Sanctions and **GRANTS** Plaintiffs' Motion for Summary Judgment.

### I. Background

Robert Jordan and Cheryl Anacker (hereafter "Plaintiffs"), pursuant to their Durable Power of Attorney for Lucille Kelly dated April 1, 2016, filed a complaint against Susan Osmun, Mrs. Kelly's former attorney in fact since September 2008, alleging breach of fiduciary duty, conversion, fraud, and unjust enrichment.

On or about September 24, 2008, Lucille Kelly executed a durable power of attorney naming her husband, Frank Kelly, and her niece, Susan Osmun, as attorneys in fact, each independently empowered to act on Mrs. Kelly's behalf. Mr. Kelly passed away in March 2015

and Susan Osmun was qualified as the executor of Mr. Kelly's estate to which Mrs. Kelly is the sole heir. Pursuant to her power of attorney, Susan Osmun sold Mr. and Mrs. Kelly's jointly owned home for $460,000 on November 20, 2015. Defendants travelled together to Virginia prior to the sale and removed Mrs. Kelly's personal property from the home. The property is now being stored in New Jersey at Defendants' home. On December 1, 2015, Mrs. Kelly, through her attorney in New Jersey, sent a demand letter to Susan Osmun requesting information about the financial status of Mr. Kelly's estate and Mrs. Kelly's personal finances. Mrs. Kelly sent a second letter to the same effect on February 3, 2016. Susan Osmun did not directly respond to the attorney letters but did send communications to Mrs. Kelly between February 3, 2016 and March 10, 2016, through a social worker at The Virginian Retirement Community, where Mrs. Kelly was living at the time. During this time, Plaintiffs allege that Mrs. Kelly was also in direct contact with David Osmun but make no mention of specific interactions.

In a letter to Mrs. Kelly dated February 5, 2016, Susan Osmun wrote that she had settled Mr. Kelly's estate, that Mrs. Kelly was in good financial shape to continue her living arrangement at The Virginian, but that any large expenditure would jeopardize the arrangement. Susan Osmun also stressed that she did not want to burden Mrs. Kelly with specifics of finances and that she had Mrs. Kelly's best interests at heart. Finally, Susan Osmun informed Mrs. Kelly that she and her husband were very upset to be yelled at and accused (in the letters from Mrs. Kelly's attorney) of not having Mrs. Kelly's best interests at heart. On March 10, 2016, Susan Osmun sent an email to the social worker with an attachment and instructions to deliver the attachment to Mrs. Kelly. The attachment listed four of Mrs. Kelly's bank accounts and their corresponding balances. The attachment stated that the account balance on the Bank of America account was $106,651.39 at the time. As of March 10, 2016, the balance in that account was

actually $4,372.79.

However, around the same date of these letters, Susan Osmun spent, withdrew, or diverted money from Mrs. Kelly's accounts on numerous occasions, including:

- Depositing checks payable to Frank and/or Lucille Kelly in the amount of $21,416.87 into Defendants' joint bank account.

- Transferring $10,000 from Mrs. Kelly's Wells Fargo Checking Account to Defendants' joint bank account.

- Writing a check for $300,000 from Mrs. Kelly's Wells Fargo Checking Account which was deposited into Defendants' joint bank account.

- Transferring $49,305.57 and $76,522.29 from two of Mrs. Kelly's bank accounts to an American Express credit card account maintained by the Defendants.

- Writing a check for $10,404.00 from Mrs. Kelly's bank account to "Renewal by Anderson" to pay for new windows on Defendants' residence as well as transferring $40,000 from Mrs. Kelly's account to make further improvements on Defendants' home.

- Transferring $5,082.00 from Mrs. Kelly's bank account to pay for Defendants' mortgage.

- Transferring $5,000 from Mrs. Kelly's bank account to a bank account maintained by the Defendants.

- Using Mrs. Kelly's Bank of America credit card to pay for products and services for Defendants' benefit and transferring $14,855.11 and $10,857.99 from two of Mrs. Kelly's bank accounts to pay the credit card bill.

- Using a debit card associated with Mrs. Kelly's bank account to pay for personal expenses totaling $31,502.83.

- Transferring $5,000 from Mrs. Kelly's bank account to Defendant Susan Osmun's son, Arrio Lusquinos.

- Writing checks from Mrs. Kelly's bank account to pay for personal expenses in the amount of $2,341.20.

Plaintiffs allege that Mrs. Kelly did not consent to or authorize any of these transactions. During her deposition, Mrs. Osmun identified specific purchases purportedly made on behalf of Mrs. Kelly totaling $21,322.43. For other purchases, she could not recall whether they were for Mrs. Kelly's benefit or for her own use. Mrs. Osmun also explained that she believed every dollar she spent was appropriate compensation for her assistance to Mrs. Kelly. After accounting for the purchases Mrs. Osmun made for Mrs. Kelly, Plaintiffs allege that $560,965.43 was withdrawn from Mrs. Kelly's accounts between March 30, 2015 and April 2016.

On April 1, 2016, Mrs. Kelly revoked Susan Osmun's power of attorney and executed a new durable power of attorney in favor of Plaintiffs. On April 6, 2016, Mrs. Kelly sent another demand for information, by and through Plaintiffs, to Susan Osmun. Susan Osmun did not respond to the letter.

Plaintiffs filed the Complaint on May 3, 2016 and alleged federal jurisdiction based on diversity of citizenship and sufficient amount in controversy. Susan Osmun moved to dismiss the Complaint for lack of diversity of citizenship on the grounds that Plaintiff Robert Jordan and Susan Osmun were both citizens of New Jersey. Plaintiffs obtained leave to amend their complaint to remedy procedural defects and add Susan Osmun's husband, David Osmun as a co-defendant. Plaintiffs filed a first amended complaint ("FAC") on July 8, 2016 alleging seven

counts.

Defendants renewed their Motions to Dismiss for lack of jurisdiction and the motions were denied by the Court on September 29, 2016. Dkt. No. 39. Defendants then moved to dismiss for failure to state a claim. Dkt. No. 42. The Court granted in part and denied in part the motion to dismiss for failure to state a claim. Dkt. No. 57. The Court dismissed counts 2, 4, and 6 in the Amended Complaint. *Id.* The remaining counts are:

Count 1: Breach of Fiduciary Duty (Susan Osmun);

Count 3: Conversion (Susan Osmun);

Count 5: Fraud (Susan Osmun);

Count 7: Unjust Enrichment (both Defendants).

During the course of the legal proceedings, Defendants drafted two quitclaim deeds intended to transfer title of their family home to Mrs. Osmun's son Arrio Lusquinos. The Court found that this transfer was based on fraudulent documentation and entered an order to that effect. After numerous additional discovery disputes, resulting in the imposition of sanctions by this Court pursuant to Rule 11 and Rule 37(d), Dkt. No. 115, Plaintiffs moved for summary judgment on the remaining counts. Dkt. No. 127. At the same time, Plaintiffs moved for further sanctions pursuant to Fed. R. Civ. P. 37(d). Dkt. No. 124. While the hearing on the Motions was already underway on June 23, 2017, Defendants submitted filings in opposition to the Motions. Dkt. Nos. 159, 160. The oppositions are written in the first person but signed by both Defendants. *See id.* The opposition to Summary Judgment incorporates the Answer as an opposition to the Motion. Dkt. No. 159, at ¶ 3. The opposition to Summary Judgment also reiterates Mrs. Osmun's position that she was entitled to reasonable compensation for which she "was easily owed close to $200,000." Dkt. No. 159, ¶¶ 4-5. Both oppositions also update the

Court on the status of Defendants' alleged attempts to settle the dispute without success and insist that the Defendants are unable to pay the damages sought. *See* Dkt. Nos. 159, 160 at ¶¶ 1-2. As noted above, a hearing was conducted in the matter on June 23, 2017 and the Court took the matter under advisement with this memorandum opinion and an order to follow.

## II. Legal Standard

### A. Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In making a summary judgment determination, the Court must bear in mind that "[a] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Sanctions Pursuant to Fed. R. Civ. P. 37

"Broadly stated, Rule 37 deals with the consequences of the failure to make discovery, and authorizes the imposition of sanctions in cases in which there has been an abuse of the discovery rules." *Stillman v. Edmund Sci. Co.*, 522 F.2d 798, 801 (4th Cir. 1975). "The Rule is flexible in its nature and the court has broad discretion in its choice of the type and degree of the

sanctions to be imposed." *Id.* The Fourth Circuit employs a four-factor test to determine what sanctions to impose: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (quoting *Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998)).

### III. Discussion

The memorandum addresses Plaintiffs' Motion for Summary Judgment, Plaintiff's request for attorney's fees pursuant to Va. Code Sec. 64.2-1615, and Plaintiff's Second Motion for Sanctions pursuant to Rule 37. As discussed below, the Court finds that summary judgment is appropriate on all of Plaintiff's claims. Plaintiff is not entitled to attorney's fees pursuant to Va. Code Sec. 64.2-1615 but is entitled to the same fees as sanctions pursuant to Rule 37.

#### A. Summary Judgment

Plaintiffs move for summary judgment with respect to the following counts alleged in the Amended Complaint: Count I (Breach of Fiduciary Duty – Susan Osmun); Count III (Conversion – Susan Osmun); Count V (Fraud – Susan Osmun); and Count VI (Unjust Enrichment – both Defendants). The memorandum addresses each of these Counts in turn.

#### 1. Breach of Fiduciary Duty – Susan Osmun

The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a duty; (2) a breach of the duty; and, (3) damages proximately caused by that breach." *Alstom Power, Inc. v. Graham*, No. 3:15CV174, 2016 WL 354754, at *2 (E.D. Va. Jan. 27, 2016).

Plaintiffs allege that Mrs. Osmun owed Mrs. Kelly a fiduciary duty arising out of the

power of attorney and statutory duties set forth in Va. Code Sec. 64.2-1612. Plaintiffs allege that these duties obliged Mrs. Osmun to act in accordance with Mrs. Kelly's reasonable expectations, in good faith, within the scope of authority in the power of attorney, with ordinary diligence exercised by agents in similar circumstances, and so as not to create conflicts of interest which would impair her ability to act as an agent. Plaintiffs contend that Mrs. Osmun's self-dealing acts are presumptively fraudulent and that the record is replete with self-dealing acts.

Virginia law makes clear that an attorney in fact bears a fiduciary duty to her principal. *See, e.g., Creasy v. Henderson*, 210 Va. 744, 749 (1970). Furthermore, a breach of that duty arises where the attorney in fact engages in self-dealing actions inconsistent with the interests of the principal. *Id.* Such conduct is presumptively fraudulent and the attorney in fact bears the burden to prove by clear and convincing evidence that the principal had full knowledge of the facts and ratified the attorney in fact's conduct. *Id.*

Mrs. Osmun has not provided any evidence to rebut the presumption that the transactions were fraudulent. At best, Defendant has offered that the fund transfers from Mrs. Kelly's accounts to her own, as well as purchases made by Mrs. Osmun for her own benefit, were appropriate compensation for her services as the attorney in fact. *See, e.g.*, Dkt. No. 129-1, 87:9-17. Specifically, Mrs. Osmun persisted in her deposition in making the general contention that all of the money which she used for her own interests constituted the appropriate compensation for her services. *See* Dkt. No. 129-1, 164:2-5 (Q. "[W]hat is your claim in this lawsuit as per reasonable compensation? How Much?" A. "Every penny I compensated myself."). Such a claim falls far short of clear and convincing evidence to rebut the fraud presumption. Furthermore, Mrs. Osmun has not provided evidence that Mrs. Kelly approved of her use of the funds. On the contrary, the letter Mrs. Osmun sent to Mrs. Kelly on February 5, 2016, refers to

repeated calls by Mrs. Kelly where she "accuse[s] [Mrs. Osmun] of all sorts of things." Dkt. No. 1-1 at 10.

For these reasons, there is no genuine material issue of fact precluding the Court's finding that Mrs. Osmun breached her fiduciary duty.

### 2. Conversion – Susan Osmun

Conversion is: (1) the wrongful assumption or exercise of the right of ownership over goods or chattels; (2) that belong to another; (3) inconsistent with, or in denial of the owner's rights. *Economopoulos v. Kolaitis*, 259 Va. 806, 814, 528 S.E.2d 714, 719 (2000). A cause of action may be sustained where the converted property is money. *Fed. Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 519 (E.D. Va. 2001), *aff'd*, 63 F. App'x 630 (4th Cir. 2003).

Plaintiffs contend that "in transferring Mrs. Kelly's funds without her knowledge or consent, Defendant Susan Osmun not only breached her fiduciary duty to Mrs. Kelly, she also converted funds belonging to Mrs. Kelly." Dkt. No. 129 at 9. As discussed in the preceding section, Defendants contend that Mrs. Osmun *properly* assumed or exercised her ownership of Mrs. Kelly's goods consistent with the rights provided by the power of attorney.

Defendants' assertion lacks support in the record. The deposition testimony reveals that very few of the expenses in Mrs. Osmun or Mrs. Kelly's accounts were directed to Mrs. Kelly. On the contrary, Mrs. Osmun directed funds from Mrs. Kelly's accounts to pay for her own expenses on her marital home, vacation with her family, and personal medical services. Mrs. Osmun acknowledged that she kept poor records of which transactions were attributable to Mrs. Kelly. Where, as here, the evidence shows that the attorney in fact received many benefits during the course of the fiduciary relationship which could neither be explained nor justified, a finding of conversion is supported. *See Oden v. Salch*, 237 Va. 525, 535 (1989) (affirming a jury

verdict on conversion charge for receipt of benefits by a fiduciary which were neither explained nor justified).

For this reason, there is no genuine issue of material fact on the conversion claim.

### 3. Fraud – Susan Osmun

The elements of fraud under Virginia law are "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 507 S.E.2d 344, 346–47 (1998) (quoting *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (1994)).

Plaintiffs contend that Defendants perpetrated two fraudulent acts against Mrs. Kelly. First, in a letter to Mrs. Kelly's caretaker at the retirement community, Defendant Susan Osmun misrepresented the amounts in Mrs. Kelly's Bank of America accounts. Second, Defendants devised two quitclaim deeds to transfer their marital home to Susan Osmun's son-in-law, Arrio Lusquinos, in an effort to avoid a lien on that home against the damages demanded in the Amended Complaint.

There can be no dispute that Susan Osmun misrepresented the amounts in the Bank of America Accounts to the social worker at the Virginian. Similarly, the Defendants misrepresented that their marital home had been devised by quitclaim deed to Arrio Lusquinos pursuant to a separation agreement between Susan Osmun and her former husband Manuel Lusquinos. The statements about the Bank of America account balances were knowingly false when made. *Compare* Dkt. Nos. 151 (affidavit of Julie Mezainis) *with* 131 (Bank of America bank statements). The same is true of the representations about the purpose of the quitclaim deeds. *Compare* Dkt. No. 94-1 (affidavit of Manuel Lusquinos and attached interspousal

agreement) *with* Dkt. No. 129-1, at 164:12-13, 166:19-23 (Q. "Why did you sign this quitclaim deed?" A. "To protect my home" . . . Q. "So why would your husband transfer a property that you both previously owned together, why would he transfer that property to your son?" A. "Because you guys were gunning after him at this point."). However, Plaintiffs have not shown that they relied on either of these misrepresentations and were damaged as a result. On the contrary, the email to the social worker only preceded the filing of the Complaint by two weeks, long after Plaintiffs began investigating the matter. The false quitclaim deeds were employed only after litigation was well underway. Thus, Plaintiffs were conducting their own investigation into Defendants' conduct and were not deceived by the misrepresentations. *See White v. Potocska*, 589 F. Supp. 2d 631, 642 (E.D. Va. 2008) ("where the person makes 'his own investigation, whether complete or not, into the subject matter at hand' he may not say that he relied on the representations of another.") (quoting *Harris v. Dunham*, 203 Va. 760, 767, 127 S.E.2d 65 (1962)).

Nevertheless, the discrete acts, taken together with the fiduciary relationship between the parties, entitle Plaintiffs to summary judgment on their fraud claim. A presumption of fraud attaches to the self-serving transactions which Plaintiffs allege were undertaken by Mrs. Osmun while acting as the fiduciary. *See Grubb v. Grubb*, 272 Va. 45, 53 (2006) ("Based on Ernest's status as Logan's attorney in fact, any transaction involving her assets that he consummated to his own benefit while acting as her fiduciary is presumptively fraudulent.").[1] "When a presumption of constructive fraud arises, the burden of proof shifts to the fiduciary to produce clear and convincing evidence to rebut the presumption." *Id.* For the same reasons discussed in the section relating to breach of fiduciary duty, *supra* III.A.1., Defendants have not met their

---

[1] Plaintiffs raise substantially the same argument in support of the claim for breach of fiduciary duty. *See* Dkt. No. 128 at 8 ("In Virginia, self-dealing by a fiduciary results in a presumption of fraud") (quoting *Al-Abood v. Elshamari*, 217 F.3d 225, 235 (4th Cir. 2000)).

burden to show that the self-serving transactions were not fraudulent.

For the foregoing reasons, Plaintiffs are entitled to judgment as a matter of law on their fraud claim.

### 4. Unjust Enrichment – both Defendants

"To state a cause of action for unjust enrichment, [Plaintiff] ha[s] to allege that: (1) [s]he conferred a benefit on [Defendants]; (2) [Defendants] knew of the benefit and should reasonably have expected to repay [Plaintiff]; and (3) [Defendant] accepted or retained the benefit without paying for its value. *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008). "A cause of action for unjust enrichment in Virginia 'rests upon the doctrine that a man shall not be allowed to enrich himself unjustly at the expense of another.'" *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 165 (4th Cir. 2012) (quoting *Kern v. Freed Co.*, 224 Va. 678, 299 S.E.2d 363, 365 (1983)). There need be no actual agreement between the parties or even an implicit promise to pay for services in order to sustain a cause of action for unjust enrichment. *Id.*

Plaintiffs contend that "Defendants received the benefit of hundreds of thousands of dollars belonging to Mrs. Kelly." Dkt. No. 129 at 11. When Mrs. Kelly authored the first power of attorney, she conferred certain obligations on Mrs. Osmun. *See supra* III.A.1. Mrs. Kelly also conferred the benefit of reasonable compensation on Mrs. Osmun for her services as an agent. *See* Va. Code. § 64.2-1610 (entitling an agent to reasonable compensation except where the power of attorney provides otherwise). Defendants contend that all of the money they took from Mrs. Kelly's accounts constituted reasonable compensation for Mrs. Osmun. But the forensic financial records offered by the Plaintiffs betray the absurdity of this defense and provide evidence in support of the remaining elements of the unjust enrichment claim against both Defendants.

For example, Defendants made a payment of nearly $36,000 against current and past balances on their American Express Card on or around February 2016. Dkt. No. 156. The money came from one of Mrs. Kelly's account. During the same time period and for nearly every month prior, Defendants had made payments for their own benefit directly from Mrs. Kelly's accounts for varying amounts. Even assuming *arguendo* that those payments each month were appropriate compensation for Mrs. Osmun's services (and there is no basis to find that the manner or the scale of the payments were reasonable) the one-off American Express payment was a significant one-off benefit to the Defendants. There is no evidence that Mrs. Osmun's services were greater during that month or the month immediately preceding so as to warrant the greater compensation.

Nevertheless, Mrs. Osmun insists that the American Express payment, like the other purchases, constitute compensation for reasonable services conferred upon her. But Mrs. Osmun knew that her services during the month of February 2016 or the preceding month were not $35,000 more valuable than in any other month and she kept no record of additional services she provided which could justify the substantial transfer. Thus, Mrs. Osmun took receipt of the funds under circumstances in which she knew the amounts exceeded reasonable compensation and therefore required repayment. Further, she drew Mr. Osmun into the conduct by using the money to pay their shared American Express bill including past due amounts. Mr. Osmun could not be ignorant to the fact that the money came from Mrs. Kelly's accounts and that Mrs. Osmun's agent services in February were not so much greater than any other month to warrant the additional compensation. He too received the benefit under circumstances in which he should reasonably have been expected to repay Mrs. Kelly. It is clear that Mrs. Kelly has not been repaid and will not be repaid absent the intervention of the Court.

Accordingly, the Court finds that there is no material issue of fact precluding judgment against both Defendants on the unjust enrichment claim.

### 5. Damages

Plaintiffs seek compensatory and punitive damages. Plaintiffs request $560,965.43 in compensatory damages; the amount of money which Plaintiffs allege was misappropriated by Defendants for their own benefit. Three hundred thousand dollars of that award has already been set aside in escrow with the Court so the entry of judgment need only impose $260,965.43 in additional damages. The amount Plaintiffs seek is supported by the voluminous documentation in support of the Motion for Summary Judgment. Though Mrs. Osmun may have been entitled to reasonable compensation for her services under the power of attorney, this entitlement ought not to reduce her damages after the fact. Mrs. Osmun admits that she failed to keep any meaningful record of the time and money she devoted to her role as power of attorney and maintains that all of the money she spent on herself and her family constitutes appropriate compensation for her services. These admissions render all but impossible any attempt to offset the damages Plaintiffs seek by an amount of reasonable compensation. Thus, the entire compensatory damages award is supported in this case.[2]

Plaintiffs also seek $100,000 in punitive damages. "Awards of punitive damages are not favored generally because they are in the nature of a penalty and should be assessed only in cases involving the most egregious conduct." *Simbeck, Inc. v. Dodd Sisk Whitlock Corp.*, 257 Va. 53, 58 (1999). For a breach of fiduciary duties, "punitive damages may be awarded only if the acts

---

[2] Plaintiffs also seek post-judgment interest on the award though pursuant to Va. Code Sec. 6-302. However, the availability of post judgment interest in diversity cases is a question of federal law. *Forest Sales Corp. v. Bedingfield*, 881 F.2d 111, 113 (4th Cir. 1989). 28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." This case is based on diversity jurisdiction and results in a money judgment in a civil case. Therefore, post-judgment interest is appropriate. The date of calculation and rate to be applied are defined by statute.

are done with malice and wantonness." *Id.* "Actual malice is defined as a sinister or corrupt motive such as hatred, spite, ill will, or desire to injure the plaintiff." *Bocek v. JGA Assocs., LLC*, 2016 WL 1161401, at *13 (E.D. Va. Mar. 23, 2016).

Plaintiffs set forth three considerations in support of the request for punitive damages. First, Defendants exercised the two quitclaim deeds in an effort to protect their home from this litigation. Second, nearly two months after her power of attorney was revoked, Mrs. Osmun endorsed a check payable to Lucille Kelly for $322 and deposited it into one of Defendants' checking accounts. Third, Defendants engaged in their conduct at a scale and under circumstances warranting a finding of malice. Specifically, Mrs. Osmun assumed her power of attorney right after the passing of Mrs. Kelly's husband and Mrs. Kelly's move out of their marital home. During the one-year period before the revocation of the power of attorney, Defendant misappropriated $560,965.43 and subsequently misrepresented the amount in the bank accounts to others working on Mrs. Kelly's behalf.

The Supreme Court has observed that "tricking the elderly out of their life savings" is among "the most serious kinds of misrepresentations" in the context of awarding punitive damages. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 589 (1996). The evidence presented in support of the Motion for Summary Judgment shows that Defendants tricked Mrs. Kelly out of her life savings. The evidence lays bare the quantity and nature of Defendants' misappropriation. Furthermore, Defendants repeatedly misrepresented information to Mrs. Kelly, the Plaintiffs, and the Court, in order to perpetuate the fraud and conceal the proceeds. Accordingly, punitive damages are appropriate to discourage Defendants from engaging in this conduct and to generally deter others from engaging in this conduct in the future.

Because the facts of this case exhibit malice in support of an award of punitive damages,

the court may award punitive damages at summary judgment. *See, e.g., Clatterbuck v. Doe*, 24 Va. Cir. 341 at *2 (1991). (granting "partial summary judgment . . . on the issue of punitive damages."). The punitive damages award is "largely a matter within the discretion of the fact finder." *Hamilton Dev. Co. v. Broad Rock Club, Inc.*, 248 Va. 40, 46 (1994). The Court judges the request for damages based on the standard employed to review a punitive damages award on remittitur. *See, e.g., Coalson v. Canchola*, 287 Va. 242, 249 (2014) (analyzing appropriateness of award challenged on remittitur). "When a trial court considers whether to remit a jury's punitive damages award, its review of the punitive damages award should consider the '[1] reasonableness between the damages sustained and the amount of the award and [2] the measurement of punishment required, [3] whether the award will amount to a double recovery, [4] the proportionality between the compensatory and punitive damages, and [5] the ability of the defendant to pay.'" *Id.* (quoting *Poulston v. Rock*, 251 Va. 254, 263 (1996)).

In this case, the Plaintiffs seek $100,000 in damages – approximately 40% of the amount which Plaintiffs allege was converted from Mrs. Kelly's assets.[3] Plaintiffs do not offer any legal or factual support for this award amount. Nevertheless the Court finds that the five *Coalson* factors favor granting the requested award. Factors one, two, and four overlap in this case; the award is reasonable compared to the damages sustained, the measure of punishment required, and the ratio of the compensatory to punitive damages. *See id.* (reinstating a $100,000 punitive damages award as compared to $5,600 in compensatory damages for egregious acts). The punitive damages will not amount to double recovery, the third *Coalson* factor, as the Court only awards the damages "to provide deterrence and retribution, as well as to punish and prevent future conduct." *Hughston v. New Home Media*, 552 F. Supp. 2d 559, 569 (E.D. Va. 2008). The

---

[3] Plaintiffs allege that Defendants spent $260,965.43 of Mrs. Kelly's money. One hundred thousand dollars is 38.32% of the total amount spent.

only *Coalson* factor which does not clearly favor the Plaintiffs is whether Defendants can pay a punitive damages award of $100,000.

Defendants protest that they cannot pay the compensatory damages award let alone any punitive damages. Dkt. Nos. 159, 160 ¶ 1 ("I replied the [consent judgment figure] was unreasonable and made a counter settlement offer of $200,000 as a lien against my home as we do not have that kind of money."). But neither party has presented a clear record of the financial condition of the Defendants. Nevertheless, the low threshold for ability to repay is more than met in this case. In *Stoots v. Dee Dee Corlette Grady*, a Circuit Court of Virginia held that a $50,000 punitive damages award (reduced from $100,000) was appropriate where the defendant was on full disability and only had $27 a month for discretionary expenses and had twelve-year old car as the only asset in her name. 2010 WL 3198640. Defendants in this case are substantially better positioned financially than the defendant in *Stoots*. Both Defendants are presently employed and currently own the house in New Jersey which Defendants have shown a willingness to use as an asset to pay their debts. *See* Dkt. Nos. 159, 160 at ¶ 1.

For these reasons, a punitive damages award of $100,000 is appropriate.

### B. Attorney's Fees Pursuant to Va. Code Sec. 64.2-1615

Plaintiffs move the Court to award their attorney's fees incurred over the course of this litigation. Plaintiffs acknowledge that a party is only entitled to attorney's fees where a statute or contract provides for recovery. Plaintiffs contend that Va. Code Sec. 64.2-1615 entitles them to recover their fees. The statute states in relevant part that:

> An agent that violates this chapter is liable to the principal or the principal's successors in interest for the amount required to: 1) restore the value of the principal's property to what it would have been had the violation not occurred; and 2) reimburse the principal or the principal's successors in interest for the attorney fees and costs paid on the agent's behalf.

17

Va. Code Sec. 64.2-1615. Specifically Plaintiffs argue that the code section permits recovery of "fees and costs."

Plaintiffs do not point to any cases applying this code section to a demand for attorney's fees for litigation against a former agent. For want of direct legal authority, the Court can rely on traditional principles of statutory interpretation. Specifically, the Court is obliged to give effect to each word or interpret the provisions in a consistent manner. *Anderson v. Hancock*, 820 F.3d 670, 674 (4th Cir. 2016).

Application of this principle demonstrates that recovery of adversarial attorney fees are not provided by the statute. The code section permits recovery of fees and costs paid *on the agent's behalf*. The same section defines the agent as the individual or entity that "violates this chapter." Va. Code Sec. 64.2-1615. Thus, fees and costs paid on behalf of the person who violated the chapter are recoverable. Adversarial proceedings undertaken *against* the agent are not undertaken on the agent's behalf. Accordingly, 64.2-1615 does not afford a statutory basis for the recovery of adversarial attorney's fees. However, as discussed below, those fees are an appropriate remedy for violations of Rule 37.

### C. Sanctions Pursuant to Rule 37

Plaintiffs contend that Rule 37 sanctions are appropriate in this case because Defendants have repeatedly shirked their discovery obligations in an effort to frustrate the litigation. Specifically, Defendants have not filed answers to interrogatories, produced responsive documents, or produced Rule 26(a)(1) or (a)(3) disclosures as required by the Court's January 11, 2017 Order. Dkt. No. 58. Based on these failures, Plaintiffs request that the Court enter default judgment in favor of Plaintiffs for the full amount of compensatory damages sought plus an award of attorney's fees and punitive damages as sought in the Amended Complaint.

Alternatively, Plaintiffs ask the Court to strike the affirmative defenses raised by the Defendants and prohibit Defendants from introducing evidence at trial in support of their defenses as well as award attorney's fees and costs incurred as a result of Defendants' failure to produce discovery.

Plaintiffs have previously moved for sanctions under Rule 11 and Rule 37(d) concerning fraudulent filings and unwillingness to participate in depositions and other portions of the discovery process. Dkt. Nos. 96, 99. The Court granted in part the motions, extending the discovery deadline, instructing Defendants to promptly and fully respond to the discovery requests, and awarding Plaintiffs attorney's fees for time expended on the motions for sanctions.

Since that Order, the evidence shows that Defendants have continued to frustrate the discovery process. In part, this may be attributable to Defendants election to litigate without counsel. They appear to not understand their obligations under the law. But it is a "fundamental principal that ignorance of the law is no excuse." *United States v. Mitchell*, 209 F.3d 319, 323 (4th Cir. 2000). Furthermore, Defendants have not changed their conduct since the Court expressly instructed them to fully comply with requests. Accordingly, further sanctions are warranted.

Because the Court is presently ruling on the Motion for Summary Judgment and thereby disposing of the entire case, much of the relief sought by the Plaintiffs is moot. One form of relief which has not been mooted is the award of attorney's fees. This remedy is especially appropriate where, as here, the entire course of the litigation has been prolonged by the intransigence and outright fraud of the Defendants, reflected in need for Plaintiffs to file motions for sanctions. So much of the litigation could have been avoided had the Defendants appropriately participated in the discovery process. Accordingly, an award of fees to Plaintiffs' counsel for their services throughout the litigation is warranted.

Because the Court awards attorney's fees as sanctions, the Court must determine the reasonable amount of the fee award. Pursuant to the Court's instruction at the hearing, Plaintiffs' counsel has submitted a detailed accounting of the fees incurred in this litigation, Dkt. No. 162, and an affidavit from Kenneth Labowitz, an experienced local attorney, attesting to the reasonableness of the fee request. Dkt. No. 161.

Where, as here, a party is entitled to recover attorney's fees, to calculate the award the Court "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). In determining the reasonable number of hours and a reasonable rate, the court may consider the twelve factors set out in *Johnson v. Georgia Highway Express Inc.*:

> (1) The time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

488 F.2d 714, 717–19 (5th Cir. 1974). There is "a strong presumption that the lodestar represents the reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (internal quotation marks omitted). After the lodestar figure is calculated, "the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *McAfee*, 738 F.3d at 88. Finally, the court "award[s] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id.*

Mr. Labowitz addresses the reasonableness of the rates in the fee request. He observes that "based on [his] experience in practice in the Northern Virginia area, the reasonable rate for a

lawyer with more than ten years' experience in plaitniffs' cases pursuing claims for breaches of fiduciary duties is $400 per hour." Dkt. No. 161 at ¶ 5. He notes that this figure is consistent with what he charges in such cases and that he has previously been awarded attorney's fees by the Court. *Id.* at ¶¶ 4-5. He further observes that the reasonable rate for an associate with eight years' experience is $250 per hour and for one-to three years' experience, $175-225 per hour. These rates are also below those set forth in *Vienna Metro LLC v. Pulte Home Corp.*, No. 1:10-cv-00502 (E.D. Va. Aug. 24, 2011), which have been recognized as an indicator of reasonable rates in this area. *See Tech Sys., Inc. v. Pyles*, 2013 WL 4033650, at *6 (E.D. Va. Aug. 6, 2013). Accordingly, the Court finds that the requested hourly rates are reasonable.

Mr. Labowitz also addresses the reasonableness of the number of hours claimed in the fee request. Mr. Labowitz attests that he has considered the twelve *Johnson* factors and found that "the expenses incurred are reasonable and appropriate to achieve the outcome sought in the case and are consistent with the general practice in such litigation in Northern Virginia." Dkt. No. 161 at ¶¶ 4, 7. The Court adds its own analysis of the pertinent *Johnson* factors.[4] Factors (1), (2), and (3) are addressed together because Plaintiff's counsel expended a reasonable amount of time considering the novelty of the legal issues – including a novel challenge to jurisdiction raised by the Defendants in a motion to dismiss. *See* Dkt. Nos. 8, 9. Counsel also expended substantial time because of Defendants' efforts to evade prosecution and judgment, including the filing of fraudulent quitclaim deeds to transfer the property to Mrs. Osmun's son. In light of these difficulties, Plaintiff's counsel needed to (and did) exercise skill to perform the services rendered. The fourth factor also supports the reasonableness of the hours. The substantial time commitment of this case, exacerbated by Defendants' recalcitrance during discovery, imposed a

---

[4] Factors (10) and (11) are omitted because they are not relevant to the Court's analysis. To the Court's knowledge, there is nothing especially undesirable about this case within the legal community. There also does not appear to be any unique nature or length of the professional relationship between the attorney and client.

heavy opportunity cost on Plaintiff's counsel in pressing the instant litigation. Factors (6), (7), and (8) are also related and support the reasonableness of the hours. Because Defendants were rapidly depleting the funds in Mrs. Kelly's accounts, substantial time limitations were imposed on Plaintiff's counsel. With diligence, Plaintiff's counsel expected to be able to recover the money converted by the Defendants and was successful in that endeavor. Thus, each of the three factors supports the reasonableness of the fees request. Plaintiff's counsel's success is a reflection of its experience, reputation, and ability as relevant to the ninth factor. Finally, factors (5) and (12) were adequately addressed by Mr. Labowitz's memo. For these reasons, the Court awards Plaintiff's counsel $64,222.51 in fees.

### IV. Conclusion

For the reasons described in the preceding section, the Court **GRANTS** Plaintiff's Motion for Sanctions (Dkt. No. 124) and **GRANTS** Plaintiff's Motion for Summary Judgment. (Dkt. No. 127). The Court shall enter a final judgment for Plaintiff consisting of: compensatory damages in the amount of $560,965.43 of which $300,000 is presently held in escrow with the Court and shall be released to Plaintiff in satisfaction of the judgment; $100,000 in punitive damages; and $64,222.51 in attorney's fees and costs as sanctions for violations of Fed. R. Civ. P. 37.

An appropriate order shall issue.

Liam O'Grady
United States District Judge

June 2017
Alexandria, Virginia